FILED

2006 FEB 27 PM 3:59

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GENERAL MOTORS CORPORATION<br>P.O. Box 400<br>Detroit, MI 48265-4000<br><br>and<br><br>LAKESHORE CHEVROLET, LLC,<br>dba Lakeshore Buick-Pontiac<br>3393 Warrensville Center Road<br>Shaker Heights, OH 44122<br><br>Plaintiffs,<br><br>vs.<br><br>SIMS BUICK PONTIAC, LLC<br>940 Babbitt Road<br>Euclid, OH 44123<br><br>and<br><br>JAY PONTIAC BUICK<br>18800 Rockside Road<br>Bedford, OH 44146<br><br>Defendants. | Case No. 1:06CV 450<br><br>JUDGE GAUGHAN<br><br>MAG. JUDGE BAUGHMAN |

## COMPLAINT

For its Complaint, plaintiffs General Motors Corporation ("GM") and Lakeshore Chevrolet, LLC, dba Lakeshore Buick-Pontiac ("Lakeshore") state as follows:

COI-1336519v1

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331.

2. Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

3. Defendant Sims Buick Pontiac, LLC ("Sims") is an Ohio corporation with its principal place of business at 940 Babbitt Road, Euclid, Ohio.

4. Defendant Jay Pontiac Buick ("Jay") is an Ohio corporation with its principal place of business at 18800 Rockside Road, Bedford, Ohio.

5. Plaintiff GM is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Michigan.

6. Plaintiff Lakeshore is a corporation organized under the laws of the State of Ohio and maintains its principal place of business in Ohio.

## BACKGROUND

7. GM is a corporation that manufactures automobiles, including Pontiac and Buick cars and trucks. GM distributes new motor vehicles to authorized dealers under the terms of a Dealer Sales and Service Agreement ("dealer agreement").

8. In mid-2005, Qua Buick-Pontiac, Inc. ("Qua"), a GM dealership, approached GM about ending its dealer agreement with GM and potentially transferring the dealership operations to another dealer.

9. Over the course of the next six to eight months, Qua negotiated with several different prospective candidates, including Lakeshore.

10. By December 2005, Qua was unable to reach agreement with any of the potential candidates, due to, among other things, issues involving third parties concerning the

lease of the dealership site. Qua then determined that it would voluntarily terminate its dealer agreement on January 6, 2006.

11. Qua did not actually close on January 6, 2006. Qua sent a follow-up letter asking to extend the termination date. Qua then continued to operate through the second week of January 2006. Within GM's computer system, the Qua dealer agreement terminated on January 12, 2006.

12. Throughout December 2005 and January 2006, Qua and Lakeshore continued their negotiations for the sale and transfer of certain dealership assets to Lakeshore. Qua and Lakeshore resolved various issues and executed certain agreements among them. In particular, Lakeshore entered into a lease agreement to lease the dealership facilities at Qua's site, as well as a purchase agreement for certain of Qua's assets. Lakeshore later purchased additional Qua dealership assets in a separate transaction, including Qua's parts, tools, computers, coffee pots, and other assets used to operate the dealership.

13. Lakeshore thereafter submitted a proposal to GM to be appointed the dealer to continue the Buick-Pontiac dealership operations in the Shaker Heights market area on February 8, 2006. GM reviewed that proposal and approved Lakeshore as the dealer to continue the Shaker Heights dealership operations on February 16, 2006.

14. Lakeshore applied to the Ohio Motor Vehicle Dealers Board (the "Board") for the necessary license and approvals and was granted a license to operate on February 17, 2006. Lakeshore began Buick and Pontiac dealership operations that same day at the same site where Qua Buick Pontiac had operated.

15. On February 17, 2006, the defendants -- two other dealerships in the Cleveland area -- each faxed a letter to the Ohio Motor Vehicle Dealers Board ("Board")

purporting to "protest" the "establishment" of a new dealership at the Qua site. That protest was nothing more than a blatant attempt to shut down an existing competitor.

16. The protests were purportedly filed under Chapter 4517 of the Ohio Revised Code even though the defendants had no right to file such protests. Under R.C. § 4517.50(A), an automobile manufacturer has to provide "notice" to existing automobile dealers in the relevant market area and a hearing is held by the Board only when a franchisor seeks to "establish an *additional* new motor vehicle dealer" or to relocate an existing new motor vehicle dealer closer to other same line-make dealerships. R.C. § 4517.50(A) (emphasis added).

17. The notice and protest procedures of the Dealer Act do not apply if another dealer is merely purchasing the assets of an existing dealership and seeking to continue dealership operations at that same site, so long as the continuation of dealership operations starts back up within 45 days. R.C. § 4517.50(D)(1) and (C)(2).

18. Lakeshore's operations are not the establishment of an *additional* new motor vehicle dealership: no new dealerships are being added to this market. Rather, the assets and dealership site of one dealership have been transferred to a new owner who is simply continuing operations that have existed in that same location for fifty-eight years. Thus, the protests filed by defendants here are baseless and the Board has no jurisdiction to hear them.

19. Under R.C. § 4517.50(D)(1), the continuation of a dealership by a new operator where the outgoing dealer has sold assets and leased the property to the new dealer is not protestable, so long as the new dealer continues the operations within 45 days, which Lakeshore did here. In this case, there is also privity between the outgoing and incoming dealers in the form of assets being purchased and other agreements. Because the new operator is continuing the former dealership at the same site, GM is expressly not required to send any

statutory notice under R.C. § 4517.50 and jurisdiction does not exist to hear the protests that were filed. Jurisdiction only arises where an additional dealership is being added to the market or there is a protestable relocation.

20. Likewise, jurisdiction for a protest with the Board does not exist under R.C. § 4517.50(C)(2). That provision specifically excludes the *sale* or *transfer* of an existing dealership from the notice and protest provisions if the new dealer is engaging in business at the same location, which is what Lakeshore is doing here. In this case, the successor dealer, Lakeshore, has purchased the dealership assets of Qua and it is leasing the existing site from a Qua affiliate. In fact, Lakeshore has purchased nearly all of Qua's assets and will continue business at the same site.

21. Because Lakeshore was merely replacing the Qua dealership within 45 days, GM was not required and did not send a notice under O.R.C. § 4517.50. There would be the same number of Buick and Pontiac dealers in the relevant market area before and after the Qua dealership ceased operations and was replaced by Lakeshore; there was no net increase in the number of Pontiac and Buick dealers in the area.

22. On February 23, 2006, the Board nonetheless faxed a letter to Lakeshore claiming that Lakeshore's license had been issued in error and thereby revoked Lakeshore's license because two protests had been filed prior to the issuance of the license. The Board "cancelled" Lakeshore's license on the grounds that protests had been filed by defendants. Those protests have enjoined GM and Lakeshore from continuing to operate the Lakeshore dealership until a hearing is held before a Board hearing examiner.

23. As a result of the Board's injunction, GM and Lakeshore have been unable to continue the Qua dealership operations. Accordingly, potential Pontiac and Buick customers

in the Shaker Heights and surrounding areas have been without the services of Lakeshore or any other dealer near the Qua location.

24. Defendants have no right to file a protest to stop the continuation of Buick and Pontiac operations and no jurisdiction exists to hear such a protest. Yet, defendants filed the protests in violation of law, thereby effectively doing exactly what is not permitted by the statute – blocking the continuation of dealership operations.

25. As a result of their baseless actions, defendants will continue to enjoy a monopoly on Buick and Pontiac operations, while consumers in Shaker Heights will continue to suffer from a lack of adequate competition for Buick and Pontiac sales. All of this will occur simply because defendants filed a sham protest that, by operation of a supposed "automatic" injunction under the statute, precluded the transfer of business operations from continuing.

26. As set forth below, it is apparent that the defendants' true motivation for filing the protests is to try to disrupt the continuation of business or destroy the value of Lakeshore's and GM's investment in the continuing Buick and Pontiac dealership. In short, the reason for the protest is to harass GM and Lakeshore and delay the continuation of Buick and Pontiac operations. As a result of defendants' purported protests, GM and Lakeshore have had to defend themselves in meritless litigation and have been enjoined from continuing the Buick and Pontiac operations even though the Ohio statute provides that Lakeshore's continuation of business at the Qua site is not protestable.

## COUNT I: VIOLATION OF SHERMAN ACT AND CLAYTON ACT

27. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully restated.

28. The Sherman Act and Clayton Act both prohibit restraints on trade that stifle competition. See 15 U.S.C. § 1 et seq.; 15 U.S.C. § 15 et. seq.; Schwegmann Bros. v.

Calvert Distillers, Corp., 341 U.S. 384 (1951). Under the Sherman Act, a horizontal restraint is a per se violation of the Sherman Act. See United States v. Topco Assoc., Inc., 405 U.S. 596, 607-08 (1972). As the Supreme Court has noted, "[o]ne of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." Id. at 608.

29. The United States Supreme Court has expressly found that "[d]ealers who press sham protests before [a motor vehicle board] for the sole purpose of delaying the establishment of competing dealerships may be vulnerable to suits under the federal antitrust laws." New Motor Vehicle Board v. Orrin W. Fox Co., 439 U.S. 96, 412 n.5 (1978). A sham protest is exactly what defendants are attempting to prosecute here.

30. In this case, defendants filed the protests for the sole purpose of delaying -- indefinitely -- the continuation of Buick and Pontiac operations at the Qua site, thereby giving defendants a monopoly on new Buick and Pontiac sales and service in that area. By significantly delaying the continuation of operations, defendants are manipulating the state statute to give effect to a privately initiated restraint on trade. That violates well-settled antitrust law. See Topco, 405 U.S. at 608-10 (holding that exclusive licensees with de facto veto over new competitors constituted impermissible horizontal restraint and is per se violation; "the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition"); American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230 (3d Cir. 1975) (holding that permitting existing franchisees to determine whether plaintiff would be allowed to enter area served by them constituted a horizontal market allocation in violation of Sherman Act); Quality Mercury,

Inc. v. Ford Motor Co., 542 F.2d 466, 471-72 (8th Cir. 1976) (reversing dismissal of claim that agreement for perpetual veto power over additional automobile dealership under antitrust law).

31. Defendants are aware that it may take weeks or months for the Board to resolve the protests and even then additional proceedings may occur. In the meantime, defendants will continue to enjoy a monopoly on selling and servicing Buick and Pontiac vehicles and thereby directly affect interstate commerce, i.e., the sale and service of new motor vehicles to customers in Ohio and elsewhere. That is prohibited by antitrust laws (the Sherman Act and the Clayton Act) and will irreparably harm GM, Lakeshore, and consumers.

32. As a direct and proximate cause of the protests defendants filed, plaintiffs have suffered and will suffer damages, including costs, expert fees, attorney's fees, and litigation expenses in excess of $75,000. In addition, the defendants' wrongful conduct, if not corrected immediately, will cause a loss of sales and revenues from Buick and Pontiac operations and a direct and consequential loss of Buick and Pontiac customers.

## COUNT II: ABUSE OF PROCESS

33. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

34. The protests filed by defendants are a legal proceeding that the defendants claim are in a proper forum and the defendants purport to claim were filed with probable cause.

35. The defendants, however, filed the protests and now continue to pervert the proceedings and the process to accomplish ulterior purposes for which a protest was not designed.

36. In Yaklevich v. Kemp, Schaeffer, the Ohio Supreme Court held that the tort of abuse of process has three elements: (1) that a legal proceeding has been set in motion in what the defendants claim is a proper forum and with probable cause; (2) that the proceeding has

been perverted to attempt to accomplish an ulterior purpose for which it was not designed, and (3) that direct damage has resulted from the wrongful use of process. 68 Ohio St.3d 294, 298 (1994).

37. Two years later, in Robb v. Chagrin Lagoons Yacht Club, Inc., the Ohio Supreme Court reversed an appellate court's ruling and found that genuine issues of material fact existed regarding whether the filing of lawsuits that were initiated to stop voting members of trustees of a club from acting on recommendations constituted abuse of process. 75 Ohio St.3d 264, 271, 662 N.E.2d 9, 14 (1996). In summarizing the tort of abuse of process, the Court explained:

> In an abuse of process case, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club."

Id. (quoting Prosser & Keeton on Torts (5th ed. 1984). See also Luciani v. Schiavone, 2000 WL 331974, at *4 (6th Cir. 2000) (stating that "[t]ypically, process is abused by an attempt to obtain a collateral advantage that is not properly involved in the proceeding at issue by using the proceeding as a weapon") (citing Robb).

38. Based on this well-settled Ohio law, defendants have committed the tort of abuse of process. Defendants filed their protests for ulterior and unlawful purposes. The protests are a sham calculated to prevent a competitor from engaging in business.

39. The foregoing conduct has been undertaken with malice and therefore also constitutes malicious abuse of process.

40. As a direct and proximate cause of the protests filed by defendants, plaintiffs have suffered and will suffer damages, including costs, expert fees, attorney's fees, and litigation expenses, in excess of $75,000. In addition, the defendants' wrongful conduct has

caused or will cause a loss of sales and revenues from Buick and Pontiac operations and a direct and consequential loss of Buick and Pontiac customers.

### COUNT III: DECLARATORY RELIEF

41. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully restated.

42. In order to resolve this controversy, GM requests that, pursuant to applicable law, this Court declare the respective rights and duties of the parties in this matter. In particular, GM requests that the Court declare and adjudicate the rights of plaintiffs and the dealers in this matter so that plaintiffs are not subject to an indefinite proceeding in the Board and that all interested parties be heard in one proceeding on an expedited basis. GM also requests the declarations set forth below in its requests for relief.

43. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

44. This action is within the jurisdiction of this Court and GM is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

45. A valid case and controversy exists for this Court to declare the rights and remedies of the parties in that defendants assert that they can block the continuation of business by Lakeshore for the foreseeable future even with a baseless protest under the Ohio Dealer Act. As a result, in the absence of a ruling from this Court on the issues raised in GM's Complaint, the rights of the parties will not be resolved until well after defendants will already have achieved what they sought in filing the sham protest – the creation and enjoyment of a monopoly from competition, all to the detriment of GM, Lakeshore, and consumers.

46. For the reasons stated above, the controversy between plaintiffs and defendants is within the jurisdiction of the Court and involves the rights and liabilities under the

Ohio Dealer Act, which controversy may be determined by a judgment of this Court. The declaration sought by plaintiffs is essential to resolve the controversy among all affected parties because a declaration as to the legality of the transfer is required.

### COUNT IV: DECLARATORY RELIEF: THE OHIO DEALER STATUTE AS APPLIED HERE CONFLICTS WITH THE COMMERCE CLAUSE

47. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully restated.

48. The statute is also unconstitutional as applied because it conflicts with the Commerce Clause. "The Commerce Clause is one of the most prolific sources of national power and an equally prolific course of conflict with legislation of the state." H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 534 (1949). Under the Commerce Clause, a statute that otherwise regulates evenhandedly as between in-state and out-of-state interests but nevertheless incidentally affects interstate commerce is unconstitutional if the burden on commerce is clearly excessive in relation to the putative local benefits. See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

49. Under the Board's view, the statute requires the Board to determine whether existing dealers in the area are adequately servicing the area. But even under that view, the determination is to be made if and only if one of the other dealers of the same line-make files a protest. See supra. In Hood, the United States Supreme Court struck down a similar provision. In that case, a New York statute authorized a New York official to withhold a license for a milk distribution facility unless the Commissioner was satisfied "'that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that the issuance of the license will be in the public interest.'" 336 U.S. at 528 (quoting statute). The Supreme

Court struck down the statute because it conflicted with the Commerce Clause. As the Court explained:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will by customs duties or regulations exclude them. <u>Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any.</u> Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

<u>Id</u>. at 539-40 (emphasis added).

      50.    Applying the same reasoning, the Supreme Court of Georgia struck down as violative of the Commerce Clause an automobile franchise statute that, like the Ohio statute, purported to allow a state agency to determine whether there was a sufficient market. <u>See General GMC Trucks, Inc. v. General Motors Corp.</u>, 237 S.E.2d 194 (Ga. 1977). In <u>General GMC Trucks</u>, the state commission denied a license to engage as a manufacturer's franchised truck dealer after another dealer objected. <u>See id</u>. at 195. The statute in that case provided that the commission may deny the license unless the existing dealer was found not to be "providing adequate representation," among other things. <u>Id</u>. at 196. The Court held that the statute violated the Commerce Clause, finding that:

> It is axiomatic that a state may not regulate interstate commerce even in the absence of federal legislation unless Congress so consents. <u>Bowman v. Chicago and Northwestern Railway Co.</u>, 125 U.S. 465, 8 S.Ct. 1062, 31 L.Ed. 700 (1887). <u>The practical effect of this section of the 1976 Act is a limitation on the number of dealers to which General Motors may market its cars for retail sales and thereby creates an undue burden on interstate commerce.</u> U.S. Constitution, Art. I, s 8.

<u>Id</u>. at 196 (emphasis added).

51. The Court also found that the legislation was "purely anticompetitive and thus not 'affected with the public interest' and within the police power of the state. The legislature may not use its power to protect a special group from competition." Id. at 197 (citing Hood). The Court held the statute unconstitutional notwithstanding that statute's recitation that the distribution and sale of new motor vehicles "vitally affects the general economy of the State and the public interest in the public welfare." Id. at 197. "The section of the statute here under constitutional attack very clearly burdens interstate commerce for it directly affects an out-of-state manufacturer seeking to market its products in Georgia." Id. at 197. As the Court explained:

> But a sharp distinction must be drawn when the validity of measures enacted by virtue of the police power is being considered under the commerce clause. For purposes of the commerce clause, genuine health, safety, or other scientifically justifiable regulations are legitimate, and the court will regard their effect upon interstate commerce as remote or incidental. <u>But measures that are only ostensibly related to such objectives, and that really are designed to promote the economic welfare or financial advantage of particular groups or individuals, will be held unconstitutional. This is because such economic legislation in fact amounts to a regulation of commerce, and with respect to interstate commerce the Constitution has conferred upon the federal government, and not the states, the power to make decisions and determine policy with regard to such matters.</u>

Id. at 198 (quotation omitted) (emphasis added). See also Buck v. Kuykendall, 267 U.S. 307, 312-16 (1925) (statute that required carriers to acquire certificate where "certificate may not be granted for any territory which is already being adequately served by the holder of a certificate" violates Commerce Clause).

52. The reasoning of Hood and GMC Truck apply here. The Ohio Dealer Statute as interpreted by the Board is "purely anticompetitive" and "protect[s] a special group from competition" by allowing competing dealers like defendants to attempt to invoke the statute

to block proposed transfer of ownership by one of their competitors. See supra. In this case, the Board contends that the statute purports to require manufacturers to prove that there are grounds to add a dealership (if and only if) one of the other dealers of the same line-make protest. In that regard, the statute contains patently anticompetitive provisions that purport to favor purely local interests at the expense of interstate commerce in violation of the Commerce Clause. See Hood, 336 U.S. at 528-34; General GMC Trucks, 237 S.E.2d at 196-97. That is contrary to the Commerce Clause.

### COUNT V: DECLARATORY JUDGMENT: THE BOARD'S INTERPRETATION WOULD VIOLATE EQUAL PROTECTION AND/OR SPECIAL LEGISLATION PRINCIPLES

53. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

54. The Board's interpretation is also unconstitutional under the equal protection clause of both the Ohio and United States Constitutions, which prohibit legislation that favors one group of citizens over others. See Ohio Const. Art. 1, § 2, and Art. 2 § 26; see also Put-In-Bay Island Taxing Dist. Auth. v. Colonial, Inc., 605 N.E.2d 21, 23 (Ohio 2002) (finding special legislation violated Ohio Constitution). In this case, the Board's interpretation creates a monopolistic effect of prohibiting transfers of automobile dealerships and, at the same time, favors new motor vehicle dealers over other kinds of franchisees that do not have a right to effectively block competition under similar provisions. There is no principled reason for giving the significant rights, including the right to block competition, that other franchisees are denied. In short, the only justification for singling out new motor vehicle dealers for the "monopolistic right" to block competition is nothing more than the political power they possess. The Ohio and United States Constitutions prohibit exactly that.

### COUNT VI: BREACH OF DUTY OF GOOD FAITH

55. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

56. R.C. § 4517.62 provides that a "franchisee having a franchise . . . shall act at all times in good faith."

57. R.C. § 4517.01(BB) defines "good faith" as "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code . . .."

58. Defendants have failed to act in good faith by purposefully and without basis for doing so filing protests to delay or prevent Lakeshore from continuing the Buick and Pontiac operations at Qua's location. Defendants filed the protests to prevent or delay Lakeshore and GM from continuing the Buick and Pontiac operations for unlawful and ulterior purposes, including without limitation the ulterior and unlawful purposes previously set forth.

59. Defendants' filing of protests were done without any good faith basis and for ulterior and unlawful purposes to prevent another dealer from continuing an existing business when defendants know, or should have known, that such continuation is allowed under the Ohio Dealer Statute.

60. As a direct and proximate cause of the protests filed by defendants, plaintiffs have suffered and will suffer damages, including costs, expert fees, attorney's fees, and litigation expenses, in excess of $75,000. In addition, the defendants' wrongful conduct has caused a loss of sales and revenues from Buick and Pontiac operations and a direct and consequential loss of Buick and Pontiac customers.

### COUNT VII: TORTIOUS INTERFERENCE

61. Plaintiffs repeat and incorporate by reference all of the foregoing paragraphs as if fully set forth herein.

62. Defendants' unlawful efforts to disrupt the transfer of assets between Lakeshore and Qua, and disrupt any prospective dealer agreement between GM and Lakeshore relating to the sale of Buick and Pontiac vehicles, amounts to tortious interference.

63. Defendants filed the "protest" and have undertaken other conduct in a malicious effort to disrupt and delay GM's prospective contractual relations with Lakeshore.

64. Defendants' interference is intentionally undertaken without privilege and designed to induce or otherwise cause interference with plaintiffs' prospective contractual relations.

65. As a direct and proximate cause of defendants' conduct, plaintiffs have suffered and will suffer damages, including costs, expert fees, attorney's fees, and litigation expenses, in excess of $75,000. In addition, the defendants' wrongful conduct has caused or will cause a loss of sales and revenues from Buick and Pontiac operations and a direct and consequential loss of Buick and Pontiac customers.

WHEREFORE, plaintiffs pray for judgment in their favor and against the defendants as follows:

66. An award of damages in excess of $300,000;

67. An award of costs of investigation and prosecution of this suit, with interest, including reasonable attorney's fees;

68. Declaratory relief as set forth above; and

69. Such other relief as this Court deems proper.

Respectfully submitted,

_____
Jeffrey J. Jones (0030059)
Douglas M. Mansfield (0063443)
JONES DAY
P.O. Box 165017
Columbus, Ohio 43216-5017
(614) 469-3939

Attorneys for Plaintiff
General Motors Corporation

_____
Peter F. Shenyey (0033267)
1701 East 12th Street, Suite 3G
Cleveland, Ohio 44114

Attorney for Plaintiff
Lakeshore Chevrolet, LLC, dba Lakeshore Buick-Pontiac